Ladies and gentlemen, good morning and please be seated. I would like the attorneys representing the parties to step up to the podium. I would like for you to tell the court your name, who you represent, and approximately how long your argument will take. Let's start with the appellate. Good morning, Counsel. Good morning, Your Honor. Mark Kudaski on behalf of Apollon Quinton Brown, and I anticipate taking about seven or eight minutes. Very good. Good morning, Counsel. Assistant State's Attorney Michelle Korda on behalf of the people of the State of Illinois. I anticipate meeting approximately 15 minutes. Very good. Okay, Mr. Kudaski, why don't you proceed with your argument. Thank you. Please report. Quinton Brown was convicted of a double homicide of Patrick Evans and Jeffrey Pinkerton. We raise three issues on appeal in regards to the matter. I would like to, if I may, start with the second issue in regards to the improper lineup, as we've asserted. The lineup concerned a witness, Cedric Hawkins. It is important to note Mr. Hawkins is the only witness who made an in-court identification. The other three witnesses, Mr. Eric Oliver with Terrence Mitchell and Paris Jackson, in court denied that Mr. Brown was the individual who did the shooting, and there was impeachment of them, some substantive, some non-substantive impeachment. Two out of three were substantive, right? I mean, it's only Mr. Oliver who made a statement to police that was used only for impeachment. Yes, in regards to Mr. Mitchell made statements to the grand jury and Mr. Jackson made statements to the grand jury. However, we believe that Mr. Mitchell's testimony involved a May 6, 2012, statement to a detective, which Detective Hammond perfected that impeachment, and we believe Mr. Jackson made statements that Detective Petrala also perfected, and those were not, per se, the statements in front of the grand jury. So I think, yes, Mr. Oliver's not substantive, but I believe parts of Mitchell and Jackson's impeachment was also not substantive. Mr. Oliver, I mean, Mr. Hawkins, was present on the June 8, 2010 incident, and on the next day he saw a photo array. Approximately 13 months later is when the lineup took place. Well, the photo array, though, conducted the next day, you're not arguing that that was suggestive in any way? I am not. It was not argued at trial, and I am not arguing that. And he picked out your client from that photo array? He did pick out Mr. Brown as somebody he thought was there. On August 2, 2011, the lineup was held. It is not the type of lineup, to be quite honest, where you have, as I believe is indicated in the Blumenshine case, where you have like four very clean-cut individuals and one disheveled. It is not a case where you have four people of one color and one person of another color. However, the lineup did have all the people seated with caps on it, but clearly at trial, and in the motion that came out, that the braids of Mr. Brown were seen through the cap, that they were open. Is it your position, counsel, that that's a distinguishing characteristic? I think so, given that it was… Why is it a distinguishing characteristic? I believe it's a distinguishing characteristic because of the nature of the statements of Mr. Hawkins. Mr. Hawkins, with his brief opportunity to observe and to see, one thing he was specific in regards to the matter was the person had braids. When the person left the store after he got up from having dived in a booth to obviously avoid the shooting and save his life, when he got up, he saw somebody from the back, and he could not see the face. So the identification in the store involved braids. That's why I think it's significant. But Mr. Brown was someone that Mr. Hawkins had seen a couple of times a week for several months, right? Correct. Okay. Which I think goes to his original statement that that's who he thought it was. In regards to the lineup, we believe that that distinguishing characteristic was suggestive. We believe that, given the original identification, that that's why Mr. Hawkins identified Mr. Brown again in the lineup as the person he thought. Counsel, let's go back to these braids. Yes. There were a lot of different colors. He didn't distinguish between these braids and other braids. He just said he had braids. He said the individual in the store had braids. Now, all braids are not the same. I would concur. So what was so special about these braids? He was the only one with braids. If it didn't matter, why would they try to put caps on all the individuals? It was just as Mason pointed out. He has seen this man on a number of occasions, and I would assume he saw those braids. Correct. He also pointed out that he walked with a limp, if I recall. Correct, but that was not part of the lineup. There was not a characteristic that needed to be muted, per se, for the lineup. The fact is, I'm not standing here saying that the police didn't try to do the best they could. The fact that they're putting caps on individuals and having them seated is certainly a step towards trying to mute individual characteristics such that it's not as clear. However, best efforts aside or efforts aside, the fact remained that they're all seated, they have caps on, and one person has braids coming out of the cap. Now, I don't think people would normally have caps on if it wasn't trying to call attention to hair, and braids is the characteristic that was there. Now, the state says in its brief that even if it's suggested it was still reliable and they went through six characteristics, I think most of those characteristics, when you look at it, go back to the braids again. Prior acquaintance braids, accuracy braids. I don't think that that solves the problem. I think that using that sixth test to say that it's still reliable at this point, I believe the proper remedy would be to remand it for an attenuation hearing, for the court to have a hearing in regards to this issue to flush that out. That's why we believe that is suggested. In regards to, with the brief time, just as I indicated when Your Honor, as far as this goes. We're not going to restrict your time. Proceed. Okay. No, I understand that. Thank you. In regards to the third issue, all I wanted to indicate was that I think the instruction for it to mean something in this case with types of impeachment, a substantive which would be grand jury in this instance for two of the witnesses, to say that the instruction at the end cures everything or covers everything, I think does not do it when each witness, more Mr. Oliver, I would agree with that, told Mr. Oliver as to the statement he was not in front of the grand jury. But couldn't a reasonable attorney, a reasonable defense attorney say to himself, I don't want to call attention to the distinction between the grand jury testimony and the statements to the police because this instruction that you say should have been given mid-trial would have told the jury. Now, some of this is just impeachment, meaning other of it is substantive evidence. Couldn't a reasonable defense attorney say, I don't want to call attention to that fact? Well, in trying to make the next chess move, anticipating what might come after that would be exactly what came in this case. The prosecutor would stand up and close an argument and lump it all together. And that's the fear. I don't understand when I look at the prosecutor's closing argument in totality, I didn't understand her to be lumping them all together. She was explaining impeachment to the jury and told them it was for them to decide. Which statement do you believe? Correct. But I think the jury should have more guidance than just that argument on the jury instruction. And I understand it was read at the end, no question about that. But how does the jury decide which is which if they're not giving guidance through the trial, especially on a trial like this where you have so much impeachment of basically three witnesses? And I think that's the point of confusion, which is dangerous when it's not read at the same time. Is it strategy? One could say that. I'm not denying that. But I think a better strategy of a seasoned criminal defense attorney would be to argue that I know what they're going to say, I have to counter it, and that instruction is the best way for me to do it. Judge, you've got to give it now. And it wasn't given. Respectfully, if you take those two issues along with the third, I believe that there is reasonable doubt when you factor out the suggestive lineup and the impeachment versus substantive. And for all those reasons, we ask that the court can either reverse or remand or remand for an attenuation hearing. And we ask for the relief song. Thank you all very much. Thank you. This quarter. Good morning. Assistant State's Attorney Michelle Korda on behalf of the people of the state of Illinois in the matter before this court. We ask that this court affirm defendant's conviction for the following three reasons. First, the evidence overwhelmingly proved defendant guilty of first-degree murder beyond a reasonable doubt. Second, the trial court properly denied defendant's motion to suppress identification because the lineup was not unduly suggestive. And third, the trial court properly instructed the jury at the close of trial. Therefore, no limiting instruction was needed at the time the testimony was given. So therefore, trial counsel was not ineffective for failing to request one, and the prosecutor's statements were proper. Turning to my second argument, the trial court's proper denial of the motion to suppress because the lineup was not unduly suggestive. Counsel, tell us why those rulings are not a distinguishing characteristic. None of the law does not require that the participants of the lineup be identical or near identical. This court has found that lineups where the individual is the only individual who is bald or the only individual who is bald and bearded have been found to be not unduly suggestive. But if the defendant has a characteristic that's different from the other people in the lineup, doesn't that suggest that maybe he's the person that was the perpetrator of the offense? No, Your Honor. In this case, we had five different individuals. However, the police did attempt to kind of negate any differences between them. They were all seated in chairs to diminish any differences in the height, and they all had hats on to better conceal their hair. But you must acknowledge that the hat didn't cure the problem because you could still see the braids. You will acknowledge that fact. Yes, Your Honor. The braids were still visible. However, the fact that the braids were visible does not make this lineup impermissibly suggestive. In fact, this court has found that an individual with braided hair in a lineup is not necessarily impermissibly suggestive just because of that fact. Furthermore, this court would need to find not only that the lineup was unduly suggestive, but also that the identification was not independently reliable. And in this case, we did not have an individual identifying some stranger that they had never seen before. Hawkins, in this case, was identifying a man that he testified he had seen previously for a couple of times a week for several months. Excuse me. That was in the store as a customer. Yes, Your Honor. He didn't. He just saw the back of the shooter. He never saw the shooter's face. Your Honor. And when he talked about the shooter to the police, he said, I thought it was this guy. Yes, Your Honor. However, Hawkins was also able to describe the fact that the defendant had on a mask and that his eyes were visible through that. That also helped aid him in his ability to identify this individual. But when he was doing the lineup, there was nothing suggestive about any of the eyes, so we're not arguing that. But when he was seeing the shooter through a mask, he's also diving under a table, as I understand it, or over a table, and trying to get out of the line of fire, trying to protect himself. And this is a customer that he's seen before in the store as a customer. Yes, Your Honor. It was someone that had previously frequented the store, and that's why he was able to identify him that day of the shooting when he turned and saw an individual. He didn't identify him. He said, I thought it was him. He didn't say it was him. He said, I thought it was him. Yes, Your Honor. But he did identify him in both a photo array and at this lineup as the individual who he saw in the store that day. In addition, he knew the defendant. He was able to view the defendant's limp and was also able to identify that as the individual that he had previously known in the store. This wasn't an individual who was identifying some stranger. He knew who this person was and was merely demonstrating to the police the individual he knew to be buck naked. But having the people in the lineup walk was not part of the lineup, right? They were just sitting in chairs with hats on. Correct, Your Honor. That is correct. However, given that the individual, Hawkins, who was making the identification, did know this particular individual, that weighs heavily in favor of reliability, that the identification of the defendant was independently reliable in this case. Turning to my first argument that when taking the evidence in the most favorable to the prosecution, the evidence overwhelmingly proved defendant guilty beyond a reasonable doubt. In addition to the lineup that Hawkins did identify the defendant in, he also testified at trial that he heard ten gunshots when this individual entered the store. He saw the defendant at the front of the store wearing jeans, a black hoodie, a mask, carrying a really big gun, and that he was able to see the eyes of this individual when he entered the store. In addition, as he watched this shooter exit the store and cross the street, he identified a really bad limp that was exhibited at that time, an identifiable really bad limp. He knew defendant as Buck Naked, a frequent customer of the store that had come in a couple of times for a few weeks, a couple of times a week for a few months prior to this shooting. All of that testimony was further corroborated by other witnesses in this case. The individual's limp was also identified by both Mitchell at trial, who testified that the man was skip running, as well as Jackson at the grand jury, who testified that this man did in fact have a limp. The testimony of Hawkins that this individual was wearing a hoodie was also corroborated by other individuals, that Mitchell stated at trial that he had on a black hoodie, Jackson testified at the grand jury that the sweatshirt was hooded, and Strickland testified that the shooter was in all black. Do you think that that's uncommon, a black hoodie? No, Your Honor, but all of this testimony does go to further corroborate the testimony of Hawkins, the eyewitness in this case. In addition, the testimony of Hawkins that this individual had a large gun was also corroborated again by Mitchell and Jackson, as was the fact that the eyes were visible. Strickland also testified at trial that this individual had on a mask, but that the eyes could be seen through that mask. Furthermore, the defendant's alibi in this case was refuted. Detective Petralia testified that the defendant had stated he was with Nearest, Haywood, and Surratt at Surratt's apartment at the time of the murders. Nearest did testify in this case that she was with the defendant, Haywood, and Surratt at Surratt's apartment at the time of the murders. However, Haywood testified stating that she was not with the defendant or Nearest at this time on this particular day when the murders occurred. Furthermore, a motive was established in this case. Detective Petralia testified that the defendant learned that Pinkerton and the other guy had placed a $2,000 bounty on his head to be killed, further establishing motive for this particular shooting. All of this evidence was cumulative to demonstrate beyond a reasonable doubt that the defendant did commit the murders in this case. What about the closing argument in which the prosecutor tries to define impeachment? Your Honor, in this case, turning to my third argument, the jury instruction that was provided, that was argued, was correct. It did legitimately outline the law in this case and was argued. It did properly describe the law in this particular case. Well, was she suggesting that if somebody made an inconsistent statement on a previous occasion, that it's the inconsistent statement that the jury has to believe? No, Your Honor. In this case, they did start by outlining that the statements were only for the limited purpose of deciding the way to be given to the testimony of the witnesses in the courtroom. Then she further outlined, or he further outlined, the ways that the testimony was to be considered and the way that the jury was to review it. The fact that there was not this prior contemporaneous oral limiting instruction given at the time of the testimony was absolutely permissible. The fact that the defense counsel may have made a strategic decision not to draw more attention to that, as Your Honor pointed out, was absolutely legitimate and does not constitute ineffective assistance of counsel. Furthermore, the oral contemporaneous instruction is merely suggested by the committee notes of the IPI instruction. It's not something that is even legally required. Therefore, the fact that that oral contemporaneous instruction was not given is absolutely not reversible error in this case. And the prosecution's statements outlining that were also permissible. For these reasons and those stated in our brief, we ask that this Court affirm defendant's conviction. Thank you, Ms. Porter. Mr. Kozatski, do you have any rebuttal? Just very briefly, Your Honor. Please, the Court. In stating that the alibi was refuted, it's worth noting just very briefly that this was brought out in the prosecution's case and then they put Hayward on and said, no, it wasn't with him. The defense then called Nearest, who did say, yes, she was with Mr. Brown when he received the call. The state then put on a detective to say that we never called Nearest's father to the station, as Nearest had suggested on direct. Nearest's father did testify and indicate he was called to the station. So we do not believe that the alibi put in by the state actually was refuted. Anything further? No, I thank you. Thank you very much. Mr. Kozatski, Ms. Porter, the Court wants to thank you for your briefs and your arguments. This matter is going to be taken under advisement and we're going to have a brief recess. We have a second case.